UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 17 CV 06922 (15 CR 149) |
| v. | ) | |
| | ) | Judge John Z. Lee |
| JONAS M. EDMONDS | ) | |

## RESPONSE TO SECTION 2255 MOTION

In his Motion to Vacate, Set Aside, or Correct Sentence, Petitioner-Defendant Jonas Edmonds ("Petitioner") contends that he was deprived effective assistance of counsel because his counsel coerced him to plead guilty despite his belief that "the government's current charges were the product of selective enforcement and that the P.S.I. Report was illegally enhanced in order to justify a plea well outside of Petitioner's true guideline range." (Dkt. #7)[1] These arguments fail. Because the record clearly establishes that Petitioner is entitled to no relief, his motion should be denied without an evidentiary hearing.

## I.    BACKGROUND

On December 4, 2015, Petitioner was charged in a superseding information with one count of conspiring to provide material support to a foreign terrorist organization, specifically the Islamic State of Iraq and the Levant (ISIL), in violation of 18 U.S.C. § 2339B(a)(1) (Count One); and making a materially false statement to

---

[1] References to "Dkt. #__" are to the relevant civil docket entries in case 17 CV 06922. References to "Cr. Dkt. #__" are to the relevant criminal docket entries in case 15 CR 149. References to "12/09/2015 Tr. at __" denote citations to the transcript of the change of plea hearing held on December 9, 2015, and references to "09/20/2016 Tr. at __" denote citations to the transcript of the sentencing hearing held on September 20, 2016.

a law enforcement officer regarding an offense involving international terrorism, in violation of 18 U.S.C. § 1001(a)(2) (Count Two). (Cr. Dkt. #48). On December 9, 2015, Petitioner pled guilty to both counts of the superseding information pursuant to a written plea agreement (Cr. Dkt. # 54).[2]

On October 14, 2016, Petitioner was sentenced to 21 years' incarceration. (Cr. Dkt. #92). On September 26, 2017, Petitioner filed this motion pursuant to 28 U.S.C. § 2255. (Dkt. #1).

## II.    FACTUAL BACKGROUND

Beginning around January 19, 2015, Petitioner's cousin, Hasan Edmonds, a member of the Army National Guard of Illinois assigned to a National Guard unit in the Northern District of Illinois, engaged in online communications with UC1, a person whom Hasan Edmonds believed was an ISIL fighter in Libya but who was in fact an FBI employee. In those communications, Hasan Edmonds expressed his support for ISIL and his desire to travel to the Middle East with Petitioner, his cousin, to fight for ISIL. Hasan Edmonds also gave UC1 advice on how to fight and defeat the U.S. military and stated that he and Petitioner were willing to conduct an attack in the United States if ordered to do so. For example, on February 2, 2015, Hasan Edmonds told UC1, "For Yunus [Petitioner] and myself we do both want to touch

---

[2] Petitioner waived all appellate rights to include appealing "his conviction, any pre-trial rulings by the Court and any part of the sentence." Petitioner also waived his "right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255" except for a "claim of involuntariness or ineffective assistance of counsel." Cr. Dkt. #54 ¶¶ 16, 17.

down in the land and we are coming for jihad fiscibilly[3] Allah. Niether of us mind staying here if those are our orders so long as we get our sisters outta her first. Honestly we would love to do something like the brother in Paris did.[4] Hit here and then go to dawlah inshaAllah. We'll fight where ever need be."

On February 6, 2015, Petitioner contacted UC1 online and said that he was planning to travel with his family to Mosul, an area of Iraq controlled by ISIL. Petitioner also told UC1 that if he was unable to travel, he intended to commit an attack within the United States in support of ISIL. Petitioner stated "The plans are made from two points. One consists of doing all I can to be able to make hijrah[5] with my family. I already let you know that I would need for that. Two, if I cant make hijrah then InshaAllah. I can unleash the lion. What I would need…honestly nothing. I am prepared to go even if its with a rock. But a small team, no more than 5 hardware and maybe a fire cracker. I do have access to hardware." From the context of this communication and other communications between Petitioner, Hasan Edmonds, and UC1, it is clear that Petitioner was informing UC1 that, if he cannot travel, he was willing to commit an attack in the United States and that he already had access to firearms.

---

[3] Throughout this response, quotations to the communications of Petitioner and Hasan Edmonds are provided verbatim.

[4] Given the context of this and other communications, Hasan Edmonds statement to doing "something like the brother in Paris did" was a reference to a January 7, 2015, terrorist attack in Paris against the satirical newspaper Charlie Hebdo.

[5] "Hijrah" is an Arabic word that means "migration."

Over the next month, Petitioner asked UC1 for guidance and assistance on Hasan Edmonds' desire to travel to the Middle East to fight for ISIL.

On February 19, 2015, a confidential law enforcement source introduced Petitioner to UC2. Petitioner believed UC2 to be an individual who could assist Petitioner and Hasan Edmonds with their intention of traveling from the United States to support ISIL, but UC2 was in fact an undercover FBI employee.

On March 3, 2015, Petitioner and UC2 met in person. During the meeting, Petitioner informed UC2 that he was meeting on behalf of himself and Hasan Edmonds, and that he was looking to assist Hasan Edmonds' travel to the Middle East ("I am here on my behalf and his behalf. The other brother behalf I am going to say that and my cousin."). The two discussed the best and safest route for Hasan Edmonds to take.

Following the March 3, 2015, meeting, Petitioner and UC2 engaged in a series of online communications concerning Hasan Edmonds' travel. Petitioner, in an attempt to facilitate Hasan Edmonds' travel to fight for ISIL, asked UC2 for a point of contact to assist Hasan Edmonds when he arrived in the Middle East.

On March 11, 2015, Hasan Edmonds told UC1 that he had purchased a plane ticket to Cairo, Egypt, in order to fight for ISIL. On March 23, 2015, UC2 met with Petitioner and Hasan Edmonds in Aurora, Illinois. During this meeting, Hasan Edmonds informed UC2 that he had been watching videos from "brothers from the State," referring to members of ISIL, and that he did not want peace but instead wanted fighting. Petitioner expressed his support and excitement for Hasan

Edmonds' travel, and said that he believed that one who supported a mujahid (a fighter) was a mujahid.

During the March 23, 2015, meeting, Petitioner informed UC2 that, after Hasan Edmonds traveled, he was planning to attack the Army National Guard installation to which Hasan Edmonds was assigned. Petitioner advised that he wanted to conduct the attack along with UC2 and that he anticipated a "body count" of 100 to 150 individuals. Hasan Edmonds offered to provide Petitioner and UC2 with a list of the "rankings" of officers for Petitioner to kill. Hasan Edmonds also confirmed that he would provide Petitioner with Hasan Edmonds' military uniforms for Petitioner to wear during the attack on the National Guard base.

On March 24, 2015, Petitioner and Hasan Edmonds, along with UC2, drove to Hasan Edmonds' National Guard base in Joliet, Illinois, for the purpose of conducting surveillance and planning for the attack. During the drive, Petitioner and Hasan Edmonds discussed with UC2 the purchasing of weapons and how to conduct an attack. Upon arrival, the three also discussed, among other things, where the National Guard members conducted their training. Hasan Edmonds described the inside of the installation and which rooms they should avoid during the attack. In furtherance of the plan to commit the attack, and to determine the timing of the attack, Hasan Edmonds entered the National Guard installation and retrieved a unit training schedule, which he then gave to Petitioner for the purpose of deciding upon a date to conduct their planned attack.

On March 25, 2015, Petitioner drove Hasan Edmonds to Chicago Midway Airport so that Hasan Edmonds could travel to the Middle East to fight for ISIL. After he dropped off Hasan Edmonds at Midway, Petitioner went to Hasan Edmonds' residence and retrieved several of Hasan Edmonds' National Guard uniforms, which Petitioner planned to use as a disguise during the planned attack at the National Guard base.

On March 25, 2015, Petitioner was interviewed by FBI agents at the FBI field office in Chicago, Illinois. Agents asked Petitioner whether he had ever helped anyone travel overseas to support ISIL. Petitioner responded that he had dropped Hasan Edmonds off at the airport to travel to Egypt because "he's going to visit a friend or wherever he's going. I don't know. Somebody, he's trying to move there." Petitioner continued by stating that Hasan Edmonds was traveling to Egypt to see if he likes it and "then he's coming back." As Petitioner admitted at his change of plea hearing, these statements to the FBI agents were lies. When he dropped Hasan Edmonds off at Midway Airport on March 25, 2015, Petitioner knew that Hasan Edmonds was traveling to Egypt to fight for ISIL—not to "visit a friend" or play tourist.

## III.  LEGAL STANDARD

"Relief under [§2255] is available only in extraordinary situations, such as an error of constitutional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013); *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004). In making that determination, this Court must review the evidence and draw all

reasonable inferences from it in a light most favorable to the government. *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000).

As the Seventh Circuit has explained, "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). Accordingly, relief under § 2255 "is available only when the sentence was imposed in violation of the Constitution or laws of the United States, the court lacked jurisdiction, the sentence was greater than the maximum authorized by law, or it is otherwise subject to collateral attack." *Swanson v. United States*, 692 F.3d 708, 714 (7th Cir. 2012) (citations omitted).

Moreover, a motion under § 2255 "is neither a recapitulation of nor a substitute for a direct appeal." *Varela v. United States*, 481 F.3d 932, 935 (7th Cir. 2007) (citation and quotation marks omitted). Because Sixth Amendment claims of ineffective assistance of counsel often involve evidence outside the trial record, such claims may be brought for the first time in a § 2255 motion. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

Finally, a district court need not hold an evidentiary hearing on a Section 2255 motion where, as here, "the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015) (citation and quotation marks omitted); *Hutchings v. United States*, 618 F.3d 693, 699-700 (7th Cir. 2010) *see also Li v. United States*, 648 F.3d 524, 532

(7th Cir. 2011); *Almonacid*, 476 F.3d at 521. Even where a Petitioner has submitted an affidavit in support of his allegations, the district court must still consider "whether a sufficient threshold showing has been made to warrant further proceedings." *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006).

## IV. ARGUMENT

Petitioner alleges that he received ineffective assistance of counsel. He appears to present two arguments in support of his claim: 1) his counsel led Petitioner to believe that a selective enforcement defense was not viable (Dkt. #7 at 8); and 2) his counsel coerced Petitioner into pleading guilty because of (a) a threatened superseding indictment and (b) a "bogus" sentencing enhancement. (Dkt. #7 at 11).[6] Petitioner seeks to withdraw his guilty plea and proceed to trial. (Dkt. #1 at 13).

On the merits, a Petitioner who has alleged ineffective assistance of counsel must "show that counsel's performance was deficient, and that the deficiency prejudiced the defense." W*iggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). An attorney's performance is deficient if it falls "below an objective standard of reasonableness." *Id.* Prejudice is established when Petitioner has shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Benefiel v. Davis*, 357 F.3d 655, 662 (7th Cir. 2004) (quoting *Strickland*, 466 U.S. at 694). "[R]equiring a showing of prejudice from Petitioners who seek to

---

[6] Petitioner's arguments are commingled throughout his filings. The government is responding to those arguments that it can unpack from the filings. The government can file a supplemental brief if the Court identifies additional arguments it wishes the government to address.

challenge the validity of their guilty pleas on the ground of ineffective assistance of counsel will serve the fundamental interest in the finality of guilty pleas." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Petitioner has not shown that his counsel's performance fell below an objective standard of reasonableness or that he was prejudiced and, therefore, he has not met his burden to sustain his claim.

### A. Petitioner's Allegations of Counsel's Failure to Pursue a Selective Enforcement Defense are Unsupported

Petitioner claims that his counsel's "refusal to properly investigate or challenge the government's charges based upon selective enforcement. . .constitutes ineffective assistance of counsel." (Dkt. #7 at 10). Petitioner claims that he has been selectively prosecuted because he is a "conservative Muslim." (Dkt. #7 at 3).

Petitioner's claim that his counsel convinced him to plead guilty because the defense of selective enforcement was not viable is insufficient to establish how his counsel was ineffective or why his attorney's performance was deficient.

A selective enforcement allegation differs from a selective prosecution allegation in that the focus is on the whether the investigation, as opposed to the prosecution, was discriminatory. *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015). Although Petitioner has limited his claim to selective enforcement against the FBI, "the same analysis governs both types of claims." *United States v. Barlow* 310 F.3d 1007, 1010 (7th Cir. 2002); *United States v. Cousins*, 2014 WL 5023485*2 (N.D.IL. 10/7/14). In order to prevail on a selective prosecution claim, Petitioner "must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motived by a discriminatory purpose." *United States v. Armstrong*,

9

517 U.S. 456, 465 (1996) (citation omitted). To establish a discriminatory effect, "the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.; Wayte v. United States*, 470 U.S. 608 (1985); *Barlow*, 310 F.3d at 1010 ("To prevail on his motion, therefore, Barlow needed to demonstrate that the agents' actions had a discriminatory effect and that the agents had a discriminatory purpose."); *United States v. Hayes*, 236 F.3d 891, 895 (7th Cir. 2001).

In support of his belief that his counsel was ineffective for failing to pursue a selective enforcement defense, Petitioner states that there are "many articles and statements of law professors and other experts blatantly alleging and outlining the illegal selective enforcement practices of the FBI in their execution of reverse terror stings." (Dkt. #7 at 7). The only evidence Petitioner supplies is a portion of a document that appears to have been filed in an unrelated proceeding and that addresses selective enforcement in terrorism cases (Dkt. #7 at Ex. E) and a portion of a newspaper article that quotes a professor who studies terrorism. (Dkt. #7 at Ex. F). Neither exhibit comes close to satisfying Petitioner's burden.

Petitioner's Exhibit E is a document that appears to be part of a filing in another matter ("the memo"), yet Petitioner has not included the entire memo leaving the other matter, as well as the author, a mystery. Nonetheless, the memo falls woefully short of Petitioner's burden.

The memo identifies the other group of similarly situated individuals as "non-Islamic extremists," who include "white national extremists, white supremacists and anti-government extremists whose actions meet the definition of violent extremists

and terrorism." (Dkt. #7 at Ex. E, p. 2). The memo goes on to state that the discriminatory effect requirement is satisfied "if a comparison between the defendant's group and the similarly situated group demonstrates that extremists who possess Islamic beliefs are more likely than extremists who possess non-Islamic beliefs, to be targeted for reverse terror stings." (*Id*. p. 3). In attempting to align the groups, the memo states that "non-Islamic extremists" are driven by an ideology that is similar to Islamic extremists and that both use similar violent tactics. (*Id*. p. 4).

These very broad strokes result in an apples to oranges comparison. First, the groups are not similarly situated. The commonality among the two groups are that they both hate the government and commit violent acts. That limited type of comparison is too broad and insufficient to support the claim that the groups are similarly situated or that the criminal behavior is comparable. *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) ("[T]he Court in Armstrong insisted that the defendant produce evidence that persons of a difference race, but otherwise comparable in criminal behavior, were presented to the United States Attorney for prosecution, but that prosecution was declined."). Petitioner was targeted because of his support to a designated foreign terrorist organization (ISIL) through his expressed desire to assist his cousin in traveling to join ISIL and to attack a National Guard base in the name of ISIL. "Non-Islamic extremists," by the very examples identified in Petitioner's memo, act domestically and are driven by an ideology based on racial superiority. A more apt comparison would be Petitioner to a group of non-Islamic individuals who conspire to provide support to foreign terrorist organizations,

11

who the FBI are aware of but who are not investigated by the FBI specifically because they are not Muslims. Petitioner has failed to suggest such a comparison or that such a scenario even exists.

Second, Petitioner's premise is fundamentally flawed – he makes no allegation that the FBI does not commit "reverse terror stings" against "non-Islamic extremists" or even that the FBI does not investigate such groups. "Entirely absent is the information essential for a selective prosecution allegation – that persons of another race who fell within Operation Triggerlock guidelines were not federally prosecuted." *Hayes*, 236 F.3d at 895.

Third, Petitioner challenges the method of investigation (reverse terror stings) used against him however, in order to prevail on a selective enforcement defense, Petitioner would have to demonstrate a *lack* of investigations against a similarly situated group based upon a protected status, not attack the *method* of investigation. In other words, discrimination is relevant if the FBI never investigated "non-Islamic" individuals or groups, not how the FBI investigates them. To that end, Petitioner does not make any allegation that the FBI failed to investigate non-Islamic extremists. *United States v. Westmoreland*, 122 F.3d 431, 434 (7th Cir. 1997)("Westmoreland makes no claim, for example, that the government failed to prosecute Caucasians whom the government believed had committed crack cocaine offenses."); *Hayes*, 236 F.3d at 895-96.

In support of his motion, Petitioner also submits a portion of an article that contains a quote from a law professor supporting the notion that right wing violence

is a greater threat than "jihadi terrorism." (Dkt. #7 at Ex. F). The underlined quotes, whether accurate or not, add nothing to Petitioner's argument that the FBI engaged in selective enforcement against him.

Petitioner has failed to allege "intentional discrimination and present facts sufficient to raise a reasonable doubt about the prosecution." *United States v. Taylor*, 798 F.2d 271, 274 (7th Cir. 1986). Petitioner's counsel "exercised reasonable professional judgment when declining" to pursue a selective enforcement or prosecution defense because there was no evidence supporting either. *United States v. Brown*, 2015 WL 7077244 *3 (N.D.IL November 13, 2015).

*The FBI Did Not Engage in a Sting Operation*

Petitioner repeatedly compares his case to stash house cases, which typically involve a reverse sting whereby a government actor introduces the subject to the idea of robbing a non-existent drug/stash house. *See generally, Ward v. United States*, 858 F.3d 1072, 1073 - 74 (7th Cir. 2017). To support his point, Petitioner alleges in is declaration that the entire conspiracy – to travel to join ISIL and to commit an attack at the National Guard base – was suggested by the FBI undercover agent. "They [the FBI] offered to buy plane tickets for my entire family and facilitate their travels overseas if I helped them commit an attack." (Dkt. #6 at ¶ 11). "During the second meeting [March 23, 2015] with the agent he essentially came with a fatwa (Islamic legal ruling) from his sheik that I should assist him in planning an attack. As well, UC2 offered money for guns and asked us for suggestions of a target for the attack." (Dkt. #6 at ¶¶ 24, 25). In effect, by comparing his situation to stash house cases,

Petitioner is arguing that he was entrapped ("Had they not manufactured a crime, targeted me, and then use[d] my religious and political views to lure me in. I would still be nothing more than a disgruntled yet law abiding American citizen." Dkt. #6 at ¶ 49).

Petitioner's version of the facts, however, are simply not true and do not support an entrapment defense. In order to prevail on an entrapment defense, a defendant must establish government inducement and a lack of predisposition. *United States v. Mayfield*, 771 F.3d 413, 431 (7th Cir. 2014). In this case, Petitioner would not have been able to satisfy either element. As the Court found, the evidence against Petitioner consisted of online communications wherein Petitioner unequivocally stated his desire to aid his cousin's travel to Egypt to join ISIL, and undercover recordings where Petitioner is clearly heard telling the UC about his plan to conduct an attack on the National Guard base. The recordings demonstrate that the idea of assisting Hasan Edmonds to travel to the Middle East to join ISIL, and the idea to commit the attack against the National Guard base, all originated with Petitioner and Hasan Edmonds. (09/20/2016 Tr. at 27 - 29). Petitioner, freely acknowledged these facts and his guilt in his plea agreement and before this Court. (12/9/2015 Tr. at 19-25).[7] Moreover, a government agent's mere contact with a

---

[7] After the government's presentation of the facts, the Court asked the following:

> THE COURT: "Mr. Edmonds, having heard the factual evidence that the government intends to present at trial if this case were to proceed to trial, do you agree that those facts as stated by the government are true?

> THE PETITIONER: Yes.
> (12/09/2015 Tr. at 25).

defendant, their solicitation of the crime or an opportunity to commit it, is not inducement. *Id.* at 432.

Petitioner's counsel exercised reasonable judgment when he did not pursue an entrapment defense, comparing Petitioner's situation to stash house cases.

## B. Petitioner Was Not Coerced Into Pleading Guilty

*Superseding Indictment*

Petitioner alleges that he was coerced into pleading guilty and accepting a plea agreement under the threat of a superseding indictment that could carry a life sentence.[8] (Dkt. #7 at p. 9). Petitioner further alleges that his counsel relayed "false threats based upon the possibility of a superseding indictment where there was no probable cause nor any conspiracy to be charged, but merely an agreement to meet to plan an attack on an unspecified future date." (Dkt. #7 at p. 10).

Prior to Petitioner's plea of guilty, the government was considering superseding the indictment to add the charge of conspiracy to commit murder, in violation of Title 18, United States Code, Section 1117. (09/20/2016 Tr. at 21). This charge requires a conspiracy to violate, among other charges, Section 1114 which is the killing of any officer or employee of any agency or branch of the United States Government to include members of the uniformed services. The charge would have been predicated upon Petitioner's agreement with his cousin Hasan to attack Hasan's

---

[8] Petitioner alleges several times that the plea negotiation process as "off record." i.e. Dkt. #7 at p. 9. The government is unclear as to what Petitioner means when he says "off record." It is clear from the letters from his counsel that Mr. Graham was keeping Petitioner informed of the discussions with the government. Dkt. #7 at Ex. D.

National Guard. Section 1117 carries a maximum sentence of life. Mr. Graham informed Petitioner of the possibility of the superseding indictment. (Dkt. #7 at Ex. C).

Petitioner's allegation that there was "no probable cause nor any conspiracy to be charged" is simply not true. The facts as stated above and as agreed to by Petitioner in the plea agreement are more than sufficient to have met the government's burden of proof in bringing this charge. Moreover, Petitioner's own comment that there was "merely an agreement to meet to plan an attack on an unspecified future date" is, along with the overt acts committed by Petitioner and his co-defendant Hasan, the definition of a conspiracy. (Dkt. #7 at p. 10).

Mr. Graham's warning to Petitioner of the potential of a superseding indictment that carried greater penalties and his advice to plead guilty to avoid a harsher sentence, was very reasonable. "To reflect the wide range of competent legal strategies and to avoid the pitfalls of review in hindsight, [the Court's] review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014)(citations omitted).

*United States Sentencing Guideline Sections 3A1.2 and 3A1.4*

Petitioner argues that he was coerced into pleading guilty to "an enhanced sentence well outside of his guideline range minus the erroneous enhancements, such as § 3A1.2 and § 3A1.4 which are not applicable and/or duplicitous." (Dkt. #1 at ¶ 12.) Petitioner also states that Guideline § 3A1.4, known as the terrorism enhancement,

16

was "premised upon this alleged conspiracy which a plan never materialized." (Dkt. #7 at p. 12). At Petitioner's sentencing hearing, Mr. Graham did not object to the sentencing guideline calculations. (09/20/2016 Tr. at 3 – 4).

Guideline § 3A1.2 applies if the victim was a government officer and the offense of conviction was motivated by such status. Petitioner's intended victims were the 100 to 150 members of the Illinois National Guard that Petitioner had hoped to kill. Guideline § 3A1.2 was applicable to Petitioner and pursuant to this guideline section, three levels were added to Petitioner's guideline level.

Guideline § 3A1.4 applies if the offense of conviction was a felony that involved, or intended to promote, a federal crime of terrorism, as defined by Title 18, United States Code, Section 2332b(g)(5). Section 2332b(g)(5)(A) defines a federal crime of terrorism as an offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of, among others, Title 18, United States Codes, 2339B, Petitioner's offense of conviction. *United States v. Van Haften*, 2018 WL 651183 at *2 (7th Cir. February 1, 2018). Petitioner's conduct was motivated by his desire to support and further the goals of ISIL, a foreign terrorist organization whose actions are designed to influence the United States government as well as other governments. § 3A1.4 was applicable to Petitioner's conduct and pursuant to this guideline section, twelve levels were added to Petitioner's guideline level and his criminal history category was Category VI. *United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011) ("To the extent that the defendants knowingly assisted Hamas, their actions benefitted

Hamas's terrorist goals and were calculated to promote a terrorist crime that influenced government."); *United States v. Awan*, 607 F. 3d 306, 314 (2nd Cir. 2010).

Guideline §§ 3A1.2 and 3A1.4 are not duplicitous. They apply to different conduct. § 3A1.2 applies when the victim is a government employee and is not limited to terrorism cases. § 3A1.4 applies when the conduct involves federal crimes of terrorism and often is not directed at specific government officials. While they overlap in Petitioner's case, both are applicable and address different aspects of Petitioner's conduct. *United States v. Swoape*, 31 F.3d 482, 483 (7th Cir. 1994).

Finally, Petitioner has not shown how he was prejudiced. The collective statutory maximum for the two counts of conviction was 23 years. The sentencing guidelines would have exceeded the statutory maximum but, pursuant to Guidelines § 5G1.1(a), were capped at the statutory maximum. Petitioner has not established that the Court was likely to sentence Petitioner to a lesser sentence if guideline §§ 3A1.2 and 3A.14 were not applicable as the sentencing guidelines are advisory and the Court was under no obligation to impose a guideline sentence. *United States v. Booker*, 542 U.S. 220, 260(2005). Considering Petitioner's conduct and statements by the Court at his sentencing ("defendant's actions were contemptible and disgraceful and warrant a significant and severe sentence" (09/20/2016 Tr. at 29)) it is highly unlikely Petitioner's sentence would have been substantially lower had the guideline range been different or if the parties had not agreed to the sentence pursuant to Fed. R. Crim. P. 11(c)(1)(C). Moreover, given Petitioner's criminal conduct, the sentence was more than reasonable.

Petitioner's complaints against Mr. Graham regarding the plea discussions, the sentencing guideline calculations, and the ultimate resolution of his case are unfounded. Mr. Graham's counsel saved Petitioner from facing a significantly greater sentence by negotiating an agreement that capped his potential sentence to a maximum that was much lower than he would have been exposed to if the government successfully superseded the indictment. Petitioner has not, therefore, established how Mr. Graham's counsel fell below an objective standard of reasonableness. *Brown*, 2015 WL 7077244 *2 ("His counsel thus enabled him to avoid a potential lifetime sentence and gave reasonable advice to avoid trial in light of the looming sentencing guidelines.").

*Change of Plea Colloquy*

Petitioner's allegations that he was coerced by his counsel into pleading guilty are unsupported by the record.

At the change of plea hearing Petitioner made no complaints about his counsel's performance despite having the opportunity to do so when questioned by the Court; on the contrary, he stated that he was satisfied with Mr. Graham's counsel:

> THE COURT: Have you fully discussed the charges in the information with your attorney?
>
> PETITIONER: Yes.
>
> THE COURT: Have you had enough time to discuss the case in general with your attorney?
>
> PETITIONER: Yes.
>
> THE COURT: Are you satisfied with the representation that you have been receiving from your attorney in this case?

PETITIONER: Yes.

12/09/2015 Tr. at 8.

The Court further asked Petitioner if he understood that he has "the right to plead not guilty to any offense that's charged against" him "and to persist in that plea?" Petitioner answered in the affirmative. (12/09/2015 Tr. at 8-9). The Court then proceeded to review with Petitioner all of the rights associated with trial. Petitioner replied that he understood those rights. The Court asked if he discussed his trial rights with his attorney. Petitioner acknowledged that he had and that he was willing to waive all his trial rights. Petitioner further stated that he understood that he was waiving his appellate rights as well. (12/09/2015 Tr. at 11-13).

Moreover, at the change of plea, Petitioner had every opportunity to contest the terms of the plea agreement. The Court entered into a detailed colloquy with Petitioner to insure that Petitioner was freely and voluntarily pleading guilty pursuant to the agreement:

> THE COURT: Mr. Edmonds, I am looking at a plea agreement in the case United States v. Jonas Edmonds. It's a 22-page document. And on the final page there are a number of signature lines, including a signature line and a signature above the name Jonas Hasan Edmonds.
>
> Is that your signature, sir?
>
> PETITIONER: Yes.
>
> THE COURT: And under it is a signature of James A. Graham. Is that the signature of your attorney?
>
> PETITIONER: Yes.

THE COURT: Have you reviewed the document, or did you review the document before you signed it?

PETITIONER: Yes.

THE COURT: Did you discuss the contents of the document with your attorney before you signed it?

PETITIONER: Yes.

THE COURT: Is there anything in this document that you do not understand as you stand here today?

PETITIONER: No.

THE COURT: Did anyone threaten you or pressure you in any way to sign this document?

PETITIONER: No.

THE COURT: Other than what is stated in this document, did anyone offer any additional promises or guarantees to you to induce you to sign the document?

PETITIONER: No.

THE COURT: Did you sign this plea agreement voluntarily and completely based upon your own free will?

PETITIONER: Yes.

THE COURT: Under this agreement, you're pleading guilty as to Count 1 and 2 of the superseding information. Mr. Edmonds, do you understand you are doing this?

PETITIONER: Yes.

(12/09/2015 Tr. at 13-14).

Petitioner's representations to this Court provides an additional basis for denying Petitioner's ineffective-assistance claim and further undercuts Petitioner's unsubstantiated and vague claims against his counsel. Had Petitioner had any

misgivings about his guilt, about the strength of the government's case, or about his counsel's failure to follow his instructions (or about the terms of his plea agreement), the Court afforded him every opportunity to raise such claims. *See Hutchings*, 618 F.3d at 699 (a Petitioner "is normally bound by the representations he makes to a court during the [change-of-plea] colloquy"). Underscoring the significance of the Court's colloquy with Petitioner is the fact that, based upon the nature of the allegations against his counsel, Petitioner should have been aware of the alleged ineffectiveness at the time of his change of plea. His failure to raise his current claims before the Court when given the opportunity is less likely a result of being disenchanted with his counsel and more likely the result of dissatisfaction with his sentence.

### C.    There is No Need for a Hearing

"A hearing is not necessary if Petitioner makes allegations that are vague, conclusory, or palpably incredible rather than detailed and specific." *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015)(citation omitted). Petitioner's allegations are just that – vague, conclusory and incredible. Because the motion, files, and records of this case "conclusively show that the prisoner is entitled to no relief," *Hutchings*, 618 F.3d at 699-700, Petitioner's motion should be denied without an evidentiary hearing.

## V.    CONCLUSION

For the reasons set forth above, the Court should deny Petitioner's motion without holding an evidentiary hearing.

Date: February 23, 2018

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    /s/ *Barry Jonas*
BARRY JONAS
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 886-8027

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

## RESPONSE TO SECTION 2255 MOTION

was served on February 23 2018, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, L.R. 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

The foregoing document was also served by First Class U.S. Mail, postage prepaid, on the following:

Jonas M. Edmonds
Prisoner No. 47846-424
USP Atlanta
U.S. Penitentiary
P.O. Box 150160
Atlanta, GA 30315


                                                      */s/ Barry Jonas*
                                                          Barry Jonas