```
              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
```

JONAS M. EDMONDS,              )    CIVIL CASE NO:
         Petitioner,           )
                               )    1:17-cv-06922
                               )
V.                             )
                               )
                               )
UNITED STATES OF AMERICA,      )
         Respondant.           )

**FILED**

APR 02 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

<u>REPLY TO GOVERNMENT'S RESPONSE</u>

<u>TO PETITIONER'S §2255 MOTION</u>

<u>PERTINENT FACTS</u>

As part of the FBI's reverse sting operation which started in late 2014, an undercover agent sent a "friend request" to Hasan Edmonds' Facebook profile (See Criminal Complaint at 8). From that point forward the FBI frequently communicated with Hasan Edmonds propagating and glorifying various extremist ideas and acts, such as joining ISIL. (See Sworn Affidavit/Declaration Docket #6 at ¶1-9). Then Hasan Edmonds, upon request of the undercover agent, introduced Me/Petitioner to the agent, also referred to by the government as UC1. The agent and Me/Petitioner talked about My/Petitioner's desire to travel overseas and join ISIL. This desire was the direct result of the propaganda (posting articles, and preaching the obligation to help fellow Muslims/ISIL) coming from the undercover FBI agent through My/Petitioner's co-defendant Hasan Edmonds. As well, "Ben Hussain" (UC1) and "Abu Saeed" (Confidential Source) had been Facebook friends with Me/Petitioner well before they sent a friend request to Hasan Edmonds. But both agents were not able to encourage

1

Me/Petitioner towards extreme views, until they targeted and convinced Hasan Edmonds; through him they were able to then convince Me/Petitioner. The agent "UC1" offered to buy plane tickets for My/Petitioner's entire family if I/Petitioner was willing to commit an attack, but I/Petitioner chose not to take the agent's offer. (Affidavit Dkt #6 ¶7-12). During the same period of time, the "Confidential Source" told Me/Petitioner that he knew someone who was helping Muslims travel overseas to join ISIL, and introduced Me/Petitioner to UC2. It was the FBI agents who initiated the discussion of aiding ISIL in any way possible. Prior to the FBI becoming Facebook friends with Me/Petitioner and their targeted propaganda I/Petitioner never desired to join ISIL, or do any terrorist attacks. Nor did I/Petitioner even remotely express such ideas or views. I/Petitioner was never associated with or a member of any designated or non-designated extremist organization or group. There was no reason for the FBI to be targeting Me/Petitioner or my cousin Hasan Edmonds except that we were conservative Sunni Muslims who they believed they could manipulate into supporting ISIL or doing a terrorist act.

I declare under the penalty of perjury that the foregoing "Pertinent Facts" are true and correct. Executed 3-26-2018.

/S/ _____
    Jonas M. Edmonds

PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL DURING "OFF RECORD" PLEA NEGOTIATION PROCESS, WHERE COUNSEL ERRONEOUSLY ADVISED AND MISLED PETITIONER INTO BELIEVING THAT SELECTIVE ENFORCEMENT WAS NOT A VIABLE DEFENSE AGAINST THE GOVERNMENT'S CHARGES

To be constitutionally sound, a guilty plea must be made both voluntarily and intelligently. McCarthy v. United States, 394 U.S. 459, 466 (1969); Boykins v. Alabama, 395 U.S. 238, 242 (1966). It has long been established that a guilty plea is not made voluntarily if a defendant is provided ineffective assistance of counsel in making his or her decision to plead guilty and forego trial. Hill v. Lockhart, 474 U.S. 52, 56-61 (1985).

The government alleges that "Petitioner claims that his counsel convinced him to plead guilty because the defense of selective enforcement was not viable is insufficient to established how his counsel was ineffective or why his attorney's performance was deficient." (Dkt #8 at 9). In the instant case, Petitioner need not prove that he would have prevailed on a selective enforcement defense at trial. He need only show evidence that a selective enforcement was viable and available defense and had he known so he would have not plead guilty but instead went to trial. Petitioner has sworn out an Affidavit to this fact. (See Affidavit Dkt #6). Petitioner was only facing 23 years with the illegal enhancements had he gone to trial and lost. Whereas, he received 21 years with the plea agreement. But for the ineffective counsel Petitioner would have gone to

3

trial on a selective enforcement defense.

### (A) PETITIONER WAS NOT TARGETED BECAUSE OF ANY DESIRE TO SUPPORT DESIGNATED TERRORIST GROUP/ISIL

The Government alleges that the FBI did not engage in a reverse sting operation, and that Petitioner was "targeted because of his support to a designated foreign terrorist organization (ISIL) through his expressed desire to assist his cousin in traveling to join ISIL and to attack a National Guard base in the name of ISIL." (See Dkt #8 at 11). But the evidence shows that the FBI agents targeted Petitioner and co-defendant via Facebook well before any of the two desired or thought of supporting any extremist groups including ISIL. (See Criminal Complaint at 8). It was because of the FBI's propaganda that Petitioner and co-defendant erroneously became convinced that they had a religious obligation to help the Islamic State in any way that they could. In fact, it was those agents who first promoted and suggested the ideas and even offered financial support, as well as Fatwas/religious rulings, as guidance and encouragement. (See Affidavit Dkt #6 ¶1-14). Every act after the initial illegal targeting by the FBI in it's reverse sting were fruit of the poisonous tree. See Wong Sung v. United States 371 U.S. 471 (1961). What prompted the decision for two FBI agents to send Petitioner and then his cousin friend requests on Facebook?

4

## (B) GOVERNMENT **DISPROPORTIONATELY** TARGETS CONSERVATIVE SUNNI MUSLIMS WITH REVERSE STING OPERATIONS

"Sting. (1976) An undercover operation in which law enforcement agents pose as criminals to catch actual criminals engaging in illegal acts." (See Black's Law Dictionary Ninth Edition). "In a reverse-sting operation, agents 'reverse' their typical strategy of identifying suspected (criminals)... through undercover... and, instead (using confidential sources or undercover agents) set up fake (crimes). (See United States v. Murrey, 2010 U.S. Dist. Lexis 125121 at FN #2).
In other words, relevant to this case, in a reverse sting it is the government who invents the crime, pays convicted con-artists, criminals or agents to scour minority or Islamic religious communities for disgruntled, financially desperate, or mentally ill patsies who can be talked into joining fake terror plots. (See The Terror Factory by Trevor Aaronson). The exaggerated significance of these manufactured terrorist plots also raise the possible penalties for those charged, due to "terrorism enhancement" sentencing provisions. The majority of defendants plead guilty to mitigate draconian penalties. In this case, it was the government agents who manufactured the initial ideal to support ISIL by travelling to Libya or by committing some kind of Attack at home in the U.S. (See Affidavit Dkt. #6 at ¶10-11). The FBI tried to hide this fact by starting it's account of the initial contact with the friend request then jumping pass all initial conversations or Facebook posts by agents all the way to the point of Hasan

Edmonds' agreement to travel and/or plan an attack. The FBI has the records of the agents' provacation and manipulation which lead Petitioner and co-defendant to break the law. This tactic by definition was a reverse sting, as it was the goverment and not the defendants who brought the criminal element, a plot, beyond mere belief or pre-disposition.

These reverse stings are sticky webs that almost always snares a person who may be disgruntled, financially desperate, or mentally ill. Therefore, it is a very serious matter when the government chooses to disproportionately target a segment of society with such a distructive weapon simply because of their particular religious views. With this weapon they are sure to push any similarly situated persons to commit an act of terrorism. Therefore, it is only a matter of whose kids do they want to go to prison for life or an extensive amount of time. It has been noted and the evidence is to overwhelming to reasonably be disputed, that even the very branding of what is "terrorism" has been reversed for members of the Islamic faith. In the Washington Post, Sunday, June 18, 2017 legal scholar Tung Yin a professor at Lewis & Clark Law School in Portland, Oregon whose academic speciality is national security law and terrorism, wrote an article titled "When Is It Terrorism?" he poses this question and lays out proof beyond a reasonable doubt that the government and the media are reserving the branding of all acts as terroristic for those who are perceived to be members of the Islamic faith and styles it, "stereotyped based law enforcement". According to Mr. Yin the government and media are choosing to label all persons that commit seemingly clear terrorist acts as "mentally

6

ill 'gunman'." He further states that "this discrepancy poses two dangers. First, the assumption that mass shootings are terrorism when perpetrated by Muslims but not by others may lead law enforcement and the public to overlook threats posed by non-Muslims. For instance, Civil rights lawyer and former FBI agent Mike German, who infiltrated white supremacist groups, has argued that the domestic threat posed by right-wing extremists groups is as great as, if not greater than, that posed by Arab or Muslim terrorists, and yet has been largely ignored by the FBI." (Id.)

This "singular focus on Muslims" is not only "stereotyped-based law enforcement" it is illegal selective enforcement in terms of who is designated a terrorist, who is targeted with the vicious reverse sting, and who will be forced to plead guilty to mitigate a draconian penalty. There are numerous members or affiliates of non-Islamic extremists group who engage in acts that meet the Federal definition of terrorism. Yet, the FBI has largely refused to target these groups, proportionately, with their deadly reverse sting operations. Such as those mentioned in Exhibit E, data that was prepared by Petitioner[1] as well as the following:

1. The Army of God (Domestic)- (Timothy McVeigh and Terry Nichols)
2. Eastern Lighting Aka The Church of the Almighty God (International with members in the U.S.A)
3. The Lord's Resistance Army (LRA) (International with members in the U.S.A)

---

1/ Exhibit E was prepared by Petitioner not an outside source.

7

4. Republic of Florida (Domestic) - (Nikolas Cruz - Parkland Fla. School shooter)

5. The National Liberation Front of Tripura (International with members in the U.S.A)

6. The Phineas Priesthood (Domestic) - (Larry Steven McQuilliams)

7. Ku Klux Klan (Domestic)

8. Aryan Nations (Domestic)

9. The Covenant (Domestic)

10. The Sword and the Arm of the Lord (CSA) (Domestic)

11. The Concerned Christians (Domestic and International) (Adam Everett Livix)

12. Alt-Reich (Domestic) (Sean Urbanski)

13. Chicago Area Skinhead (CASH) (Domestic) - (Christian Picciolini)

14. Vanguard America (Domestic) - (James A. Fields) (Charlettesville)

## THE IDEOLOGY OF SUPREMACY IS THE BASIS OF COMPARISON

"Supremacy. (16c) The position of having the superior or greatest power or authority." (Black's Law Dictionary, 9th Edition).

"Superior, adj. (14c) (Of a rank, office, power, etc.) higher; elevated; possessing greater power or authority; entitled to exert authority or command over another." (Black's Law Dictionary 9th Edition).

"Supremacist: an advocate or adherent of some concept of group supremacy." (Webster's Third New International Dictionary, unabridged).

8

Non-Islamic extremists are driven by the same ideology that drives Islamic extremists and they both use the same tactics. The government erroneously argues that the only "commonality among the two groups are that they both hate the government and commit violent acts." (See Dkt. #8 at 11). This is completely false. Their greatest commonality and the driving force behind their terrorism is the expressed belief in "group supremacy". And, their extreme desire to create a state based upon that Ideology. Like Christian extremists and white supremacist, Islamic extremists are driven by an inherent belief in superiority. They believe that it is their devine destiny to establish the superiority of Islam above all other beliefs and thereby raise the Muslim community above all other people. The draw this idea from the literal interpretation of the Quranic verse: "He it is who has sent His Messenger with guidance and the religion of truth to make it victorious over all (other) religions even though the polytheists/disbelievers hate (it)." (Noble Quran, Chapter 61 verse 9). And the verse: "And fight with them until there is no more persecution or oppression, and religion becomes Allah's in it's entirety" (Id. Chapter 8 verse 39).

Because of their fundamentalist views Islamic extremists interpret these verses to mean that it is their duty and divine right to establish a state based upon Islamic supremacy. In the same manner, extreme Christians, white supremacist, and anti-government groups are all driven by their belief in the supremacy of their groups and the desire to establish a country/state upon that ideology and they are willing to commit violence to further that aim. Christian Picciolini a former

leader of the Chicago Area Skinheads (CASH), was interviewed on WTTW's Chicago Tonight on August 21, 2017 about the idea of white supremacy and he expressed his firm belief that: "Supremacy : it's terrorism".

### ISLAMIC EXTREMISTS ARE EIGHTY TIMES MORE LIKELY TO BE TARGETED BY FBI THAN NON-ISLAMIC EXTREMISTS

Many of those who are affiliated with non-Islamic groups committed some of the worst acts of terrorism in American history. And, before committing those acts they made declarations informing the public, who in turn informed the FBI that they would be committing said crimes. Yet, the FBI ignored their claims while some where else actively encouraging a Muslim to join ISIL. For example, Nikolas Cruz, an affiliate of a radical group out of Tallahassee Florida called the Republic of Florida (ROF) had made several such declarations and the FBI was made aware that he planned on shooting students at his former school. The FBI ignored these claims. Now students across the country are protesting. And still, every time a non-Muslim commits an act of terror, like Nikolas, the FBI calls them mentally ill, and plays off any connection to non-Muslim extremist groups. Yet, the opposite is the case with conservative Muslims. The FBI looks for every remote connection even to the point of the websites that one has visited, ever. In this case, at bar, the FBI found no previous ties to any extremist groups. In fact, the FBI returned every computer, cell phone or any other memory files taken. Nothing was presented as evidence of a prior connection or affiliation to an extremist group or person.

"Even more unsettling is the flawed reasoning that drives the use of these methods. FBI agents have been inundated with bigoted training materials that falsely portray Arabs and Muslims as inherently violent. The FBI also has embraced an unfounded theory of 'radicalization' that alleges a direct progression from adopting certain beliefs, or expressing opposition to U.S. policies, to becoming a terrorist. With such a skewed and biased view of the American Muslim community, the FBI's strategy of 'preemption, prevention, and disruption' results in abusive surveillance, targeting, and exploitation of innocent people based simply on their exercise of their First Amendment rights." (See Michael German, a former FBI agent's review of Terror Factory). This subject is far too broad to properly address by motion. This court must order an evidentiary hearing, discovery, and appoint counsel in order that this issue can be adequately presented. It is Petitioner's firm belief that selective enforcement was a viable defense and had he known so he would have gone to trial, even against conspiracy charges, instead of accepting a plea that was only two years less than his statutory maximum.

## THERE WAS NEVER A CONSPIRACY TO CHARGE

<u>Conspiracy</u> n. (14c) An agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective, and (in most states) action or conducted that furthers the agreement; a combination for an unlawful purpose. 18 USCA §371.

° Conspiracy is a separate offense from the crime that is the

11

object of the conspiracy. A conspiracy endes when the unlawful act has been committed or (in some states) when the agreement has been abandoned." (Black's Law Dictionary 9th Edition). There was never a conspiracy that could have been charged. At best the defendants conspired to conspire which is no crime in America. The government also uses the fact that Petitioner and co-defendant (Hasan Edmonds) showed UC2 where the National Guard base was, and Hasan Edmonds described the National Guard base and it's personnel to UC2 as it's basis of the threatened conspiracy. But this can hardly be said to be a conspiracy because there was never any agreement to commit an attack, only the agreement between Petitioner and UC2 to meet some day and plan an attack, i.e to see if it was even possible. And the selecting of a date to meet and plan an attack was contingent upon Hasan Edmonds' travels being successful. Even if there had initially been a true conspiracy, it was abandoned as is evidenced by the fact that even before the meeting with UC2 Hasan Edmonds went to his other source who he didn't know was an agent (UC1) and made plans to join ISIL in Lybia. (See Affidavit Dkt. #6 at ¶19).

## ENHANCEMENTS WERE ILLEGAL AND USED TO EXAGGERATE PLEA DEAL

Petitioner's conduct was not motivated nor designed to influence the United States government. The government erroneously believes that Title 18 USCS 2332b(g)(5)(a) statement: "against government conduct," means any government in the world. Yet, the same statute at 2332b(b)(1)(c) it states

as Jurisdictional bases:

(c) The victim, or intended victim, is the United States Government, a member of the uniformed services, or any official, officer, employee, or agent of the legislative, executive, or judicial branches, or of any department or agency, of the United States.

This section makes clear that the intented victim is the United States, which was not the case in the case at bar. At the time of supposed trip there were no U.S. personnel in Lybia at war with ISIL. Therefore, the enhancement is illegal and was only used to justify a plea agreement to a draconian sentence. Petitioner's attorney should have objected and should not have coerced Petitioner to plea, thus he was ineffective at sentencing.

CONCLUSION

As the government did not dispute that Petitioner did request counsel to pursue the selective enforcement defense. And that counsel said there was no selective enforcement. Petitioner requests the appointment of counsel and an evidentiary hearing along with full discovery. The government has all of the necessary data needed to demonstrate beyond prima facie evidence, as was show above, that the FBI has been engaged in selective enforcement by targeting conservative Sunni Muslims, especially with reverse stings, to a severely disproportionate rate; far beyond that of any other group. Petitioner's counsel was ineffecitve. Except for counsels erroneous advice Petitioner would have went to trial, even against a possible superceding

13

indictment for an abandoned conspiracy to meet. Selective enforcement was a viable defense that Petitioner was denied.

Respectfully Submitted,

/S/ _____
Jonas M. Edmonds #47846-424

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing "Reply to Government's Response" was placed in the legal mail box with first class postage addressed to:

    Clerk of the U.S. District Court
      United States Court House
      219 South Dearborn Street
       Chicago , Illinois 60604

On this 5th day of March 2018

/S/ _____
Jonas M. Edmonds 47846-424
FCI Atlanta
P.O. Box 150160
Atlanta, Ga 30315

Jonas Edmonds 40844-424
FCI Atlanta
P.O. Box 150160
Atlanta, GA 30315













RECEIVED
2018 APR -2 AM 8:51

Clerk of the U.S. District court
United States Court House
219 S. Dearborn Street
Chicago, Illinois 60604



04/02/2018-5





U.S. POSTAGE
PAID
ATLANTA, GA
30315
MAR 23, 18
AMOUNT
$0.00
R2304E105052-22

Legal Mail